590 A.2d 1348

**ALLLEGHENY INTERMEDIATE UNIT, Appellant,**

v.

**ALLEGHENY INTERMEDIATE UNIT EDUCATION ASSOCIATION, Appellee.**

Commonwealth Court of Pennsylvania.

Argued Oct. 4, 1990.

Decided May 3, 1991.

could never be entered against a Commonwealth University's employees.

Donald J. Palmer, with him, Patrick J. Clair, Goehring, Rutter & Boehm, Pittsburgh, for appellant.

Ronald N. Watzman, Litman, Litman, Harris, Brown and Watzman, P.C., Pittsburgh, for appellee.

Before PELLEGRINI and BYER, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

This is an appeal from the Court of Common Pleas of Allegheny County affirming an arbitration opinion and award between the Allegheny Intermediate Unit (School District) and the Allegheny Intermediate Unit Education Association (Union), involving a dispute that arose as a result of a staff realignment when the School District refused a teacher's request to transfer to another program.

This dispute stems from a sequence of personnel moves known as "bumps" made as a result of the realignment of professional staff pursuant to the Section 54(c) of the collective bargaining agreement between the School District

and the Union.[1] These moves began when Jeanne Kmetz–Donovic was bumped from her teaching position by another teacher with more seniority. Because Kmetz–Donovic, in addition to holding several teaching certificates, was certified as a school psychologist, she exercised her right to bump Krall, who bumped school psychologist Strommer, who bumped school psychologist Siegal. Siegal could not bump any other professional employee because he was only certified as a school psychologist and had less seniority than any other professional employee who bumped into the school psychologist position.

The School District refused to allow Kmetz–Donovic's bump, because allowing that bump would set forth the sequential bumps that could result in Siegal being furloughed. In its written refusal, the School District explained that if it allowed the request, additional realignments would have occurred, the ultimate result of which would be the furlough of Siegal, the least senior psychologist. The School District further explained that Siegal, who had eight years' seniority as a psychologist, would have to be furloughed, because the only open positions were for

1. Section 54(c) provides:
   C. Realignment
   1. Following the determination of ECP/NPS program or center needs for the new school year, the program and centers will conduct their own realignment to determine teachers with the least amount of seniority within a center or program within their area of certification and these will be the teachers who will leave the center or program. Employees who do not choose a position at this time will have options (1) and (2) under C(5)—Realignment.

   . . . . . .

   5. Teachers without specific assignments may select one of the open positions. In the event they do not select one of the open positions, there are two options:
   Option 1. They may select a position within their building or within their program occupied by a teacher with less seniority.
   Option 2. If they desire a position outside their building or program occupied by an employee with less seniority, they will be considered primarily on the basis of seniority in the ECP/NPS. However, they may also be considered on the basis of experience, seniority, teacher evaluation, academic background, preparation. If realignment request is denied, the Assistant Executive Director/NPS or designee of the ECP will notify the employee in writing of the reasons for denial.

teachers and he had no teaching certificate. The School District stated that it could not furlough the psychologist because Section 1124 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 11–1124, dictates the only circumstances which would permit such action, and those circumstances did not exist. The School District offered Kmetz–Donovic her choice of teaching positions instead.

Kmetz–Donovic filed a grievance because she was denied the job of school psychologist. The parties were unable to reach an accord and the matter was referred to an arbitrator. In interpreting Section 54(c) of the collective bargaining agreement, the arbitrator found that nothing prohibits a teacher from bumping into a psychologist position, even if that bump ultimately results in the furloughing of an employee who has more seniority than other employees who are not being furloughed. The School District appealed the arbitrator's decision to the trial court, which found that the arbitrator's decision was drawn from the essence of the agreement and dismissed the School District's appeal. The instant appeal followed.

Our scope of review in matters appealing an arbitrator's decision is very limited. The arbitrator's decision will not be overturned as long as it draws its essence from the collective bargaining agreement. *Leechburg Area School District v. Dale,* 492 Pa. 515, 424 A.2d 1309 (1981). This "essence test" has been explained by our Supreme Court as follows:

> This so-called 'essence test' draws its origins from federal decisional law which mandates judicial deference to an arbitrator's findings.
>
> 'It is the arbitrator's construction which was bargained for, and so far as the arbitrator's decision concerns the construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.' *United Steelworkers v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

The essence test requires a determination as to whether the terms of the agreement encompass the subject matter of the dispute. Where it is determined that the subject matter of the dispute is encompassed within the terms of the agreement, the validity of the arbitrator's interpretation is not a matter of concern to the court.

*Id.* 492 Pa. at 520–21, 424 A.2d at 1312–13.

The School District contends that the arbitrator's decision is not derived from the essence of the collective bargaining agreement for several reasons. First, it contends that the arbitrator exceeded his authority by finding that Section 1125.1 of the School Code [2] does not allow it to reject a personnel move if it deems it to be educationally unsound.

In *Dallap v. Sharon School District,* 524 Pa. 260, 571 A.2d 368 (1990), our Supreme Court, interpreting Section 1125.1, held that in a realignment caused by declining enrollment, school districts must replace less senior employees with more senior employees who carry proper certification. The Supreme Court then stated:

2. Section 1125.1 provides in relevant part:

(a) Professional employes shall be suspended under section 1124 (relating to causes for suspension) in inverse order of seniority within the school entity of current employment. Approved leaves of absence shall not constitute a break in service for purposes of computing seniority for suspension purposes. Seniority shall continue to accrue during suspension and all approved leaves of absence.

. . . . .

(c) A school entity shall realign its professional staff so as to insure that more senior employes are provided with the opportunity to fill positions for which they are certificated and which are being filled by lesser senior employees.

. . . . .

(e) Nothing contained in section 1125.1(a) through (d) shall be construed to supersede or preempt any provisions of a collective bargaining agreement negotiated by a school entity and an exclusive representative of the employes in accordance with the act of July 23, 1970 (P.L. 563, No. 195), known as the "Public Employe Relations Act"; however, no agreement shall prohibit the right of a professional employe who is not a member of a bargaining unit from retaining seniority rights under the provisions of this act. (Footnotes omitted.)

[W]here circumstances admit of more than one possible realignment ... the district may consider the impact of each on the educational program to determine which is most sound, so long as within the chosen plan more senior employees are provided with the opportunity to fill positions for which they are certificated and which are being filled by less senior employees.

*Id.* 571 A.2d at 370.

The School District contends that it has a right to reject Kmetz–Donovic's bump because such a personnel move would be educationally unsound and would result in less senior employees not being furloughed, both of which they contend are in violation of Section 1125.1 of the School Code.

■ Assuming the School District's argument is valid that Section 1125.1 provides that a school district may consider the educational needs of the district when making staff realignments, and that moves had to be made so that less senior employees were furloughed, that argument does not apply in this case. Subsection (e) of Section 1125.1 authorizes that collective bargaining agreement to establish different criteria for staff realignments, including the school district's right to reject a personnel move because it deems it to be educationally unsound. Section 1125.1(e) of the School Code, 24 P.S. § 11–1125.1(e). The arbitrator ruled that Section 54(c) of the collective bargaining agreement removed from the School District the right to reject a personnel move because it purportedly was educationally unsound. Because this interpretation by the arbitrator draws its essence from the agreement, we will not disturb it on appeal.

Next, the School District contends that the arbitrator's decision fails to draw its essence from the collective bargaining agreement because it requires the School District to furlough an employee in contravention of Section 1124 of the Code. The School District argues that if Kmetz–Donovic is allowed to "bump" into a school psychologist position, this will lead to the furlough of Siegal, the most junior

psychologist. It contends that Siegal cannot be furloughed because his furlough is not a result of any statutory reasons permitted under Section 1124.

Section 1124 of the School Code, 24 P.S. § 11–1124, provides:

Any board of school directors may suspend the necessary number of professional employees, for any of the causes hereinafter enumerated:

(1) Substantial decrease in pupil enrollment in the school district;

(2) Curtailment or alteration of the educational program on recommendation of the superintendent, concurred in by the board of school directors, approved by the Department of Public Instruction, as a result of substantial decline in class or course enrollments or to conform with standards of organization or educational activities required by law or recommended by the Department of Public Instruction;

(3) Consolidation of schools ...;

(4) When new school districts are established as a result of reorganization of school districts ...

In prior decisions, we have held that Section 1124 "enumerated reasons are the exclusive basis on which a suspension of a professional employee may be made ... A suspension on any other basis is invalid." *McKeesport Area School District v. Cicogna*, 125 Pa.Commonwealth Ct. 99, 558 A.2d 116 (1989); *Hixson v. Greater Latrobe School District*, 52 Pa.Commonwealth Ct. 92, 95, 421 A.2d 474, 476 (1980).

Relying on *Cicogna*, the School District contends that while Kmetz–Donovic's bump may have resulted from a decrease in enrollment, the furlough of Siegal would not be for that reason or any other reason set forth in Section 1124. The School District's reliance on *Cicogna* is misplaced.

*Cicogna* dealt with six teachers being furloughed because of declining enrollment. There, after who was going to be

furloughed was determined, the school district approved the dropping of a certificate by a teacher with multiple certifications, resulting in the lay-off of Cicogna, who was not scheduled for furlough, and the recall of another teacher. We held that Cicogna was furloughed as a result of the school board's positive action approving a teacher dropping a certification, not declining enrollment or any other reason set forth in Section 1124 of the School Code permitting a school district to furlough professional staff. In *Cicogna*, the crucial factor was that the school district participated in a process that resulted in the furlough of a particular teacher, not based on declining enrollment, but by taking an action that had the effect of distorting both who was going to be furloughed and the collective bargaining process.

Nothing like that took place in this situation. There was no action here by the School District to affect who would be furloughed. It was the individual decision of every professional employee in the unit deciding where he or she was going to "bump" that resulted in the outcome of who was going to be furloughed. Each of those "bumps" that may eventually lead to Siegal's lay off was the direct result of declining enrollment in the district. This result was mandated under the collective bargaining agreement, which gave each professional employee based on seniority the right to bid into any position he or she desired, without exception. If the School District wanted a different outcome in reduction of professional staff due to realignment, then it was incumbent on it to have negotiated for that outcome in the collective bargaining process.

Because the parties have negotiated the method by which employees will be furloughed as a result of declining enrollment and the furlough was for a reason set forth in Section 1124, the arbitrator's decision is derived from the essence of the argument. Accordingly, the decision of the trial court dismissing the School District's appeal from the arbitrator's decision is affirmed.

ORDER

AND NOW, this 3rd day of May, 1991, the order of the Court of Common Pleas of Allegheny County, No. GD89-20374, dated January 18, 1990, is affirmed.

NARICK, Senior Judge, dissenting.

I respectfully dissent. I agree with the majority that Pennsylvania law favors the arbitrator's decision in matters arising out of the interpretation of the provisions of a collective bargaining agreement, and that reviewing courts must give great deference to such decisions regarding matters of fact. In *Scranton Federation of Teachers, Local 1147, AFT v. Scranton School District*, 498 Pa. 58, 444 A.2d 1144 (1982), the Pennsylvania Supreme Court explained:

> In labor disputes resolved by arbitration machinery, the less judicial participation the better.... Accordingly, the oft-repeated 'essence' test was adopted by this Court in 1977, ...
>
> > To state the matter more precisely, where a task of an arbitrator, PERA or otherwise, has been to determine the intention of the contracting parties as evidenced by their collective bargaining agreement and the circumstances surrounding its execution, then the arbitrator's award is based on a resolution of a question of fact and is to be respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.... It was this approach which was meant to be suggested by the brief statement ... that 'the arbitrator's interpretation must be upheld if it is a reasonable one.'

*Id.*, 498 Pa. at 64–65, 444 A.2d at 1147 (1982), (quoting *Community College of Beaver County v. Community*

*College of Beaver County, Society of the Faculty*, 473 Pa. 576, 593–94, 375 A.2d 1267, 1275 (1977)) (citations omitted).[1]

Section 7302 of the Uniform Arbitration Act, 42 Pa.C.S. § 7302 (Act), provides in part that:

> a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of the subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.

This section does empower our courts to set aside arbitration awards which are against the law. It follows if the decision of an arbitrator is contrary to law, then it cannot be said to draw its essence from the collective bargaining agreement. We must, accordingly, substitute our judgment for that of the arbitrator in the same way that we make a substitution in cases involving a judgment notwithstanding the verdict. In this case, I believe that the decision of the arbitrator violates Section 1124 of the School Code.[2]

In this case the school district's (School's) position is that the arbitrator's decision is contrary to Section 1124 of the

---

**1.** The Pennsylvania standard mirrors the federal standard explained in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The United States Supreme Court established the federal policy that arbitration under a collective bargaining agreement is the preferred manner of the resolution of labor disputes and the less judicial participation the better. Further, the court stated:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest *an infidelity to this obligation courts have no choice but to refuse enforcement of the award* (emphasis added).

*Id.* at 597, 80 S.Ct. at 1361.

**2.** The Uniform Arbitration Act substantially continues the standard of review which was established in the Arbitration Act of 1927, Act of April 25, 1927, formerly 5 P.S. §§ 161–179, repealed by Act of October 5, 1980, P.L. 693.

Public School Code of 1949 (Code),[3] and therefore does not derive its essence from the collective bargaining agreement. The School argues that because the arbitrator's decision forces it to grant Kmetz–Donovic's request for a transfer another professional employee will be furloughed as a result of that action even though none of the circumstances which would allow a furlough exist. This, the School believes, is contrary to the provisions of Section 1124 and prior decisions of this court.

I believe that this case is controlled by our interpretation of Section 1124 in *McKeesport Area School District v. Cicogna*, 125 Pa.Commonwealth Ct. 99, 558 A.2d 116 (1989), a decision which the majority attempts to distinguish. In that case the school district was faced with a situation of declining enrollment which required the dismissal of six teachers. The district used a "checkerboard" system of realigning its staff, whereby teachers were assigned to various positions within their respective certifications in order to lay off the least senior employees. The reassignments were made and six teachers were furloughed.

After the furloughs were determined, a teacher with dual certification who was slated for reassignment, dropped her second certification and avoided the change. As a consequence of this action, other shuffling ensued. The ultimate result of these subsequent changes was that a vacancy was created in the physical education department and the most junior business teacher, Mr. Cicogna, found himself without a position. Because Cicogna's certification did not match the physical education vacancy, the school laid off Cicogna and rehired a physical education teacher previously furloughed.

When *Cicogna* came before this Court, we held that the layoff did not result from the decrease in enrollment which set the entire shuffle in motion. Rather, we found that the seventh layoff occurred because a dually certified teacher was permitted to drop a certification to avoid being moved. We were drawn to that conclusion by the inescapable fact

3. Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 11–1124.

that the school board had achieved the six furloughs required by the drop in enrollment before the certification change was made. Only after the certification change was made, did the seventh furlough become necessary. *Id.* In other words, but for the change in certification, Cicogna would not have been suspended.

It is significant that the realignment which spawned from the declining enrollment, as well as that occasioned by the change in certification, took place before school resumed. None of the furloughs took effect until the commencement of the school year, and yet we held that the seventh furlough was not the result of declining enrollment, even though that was the force that set the entire ball rolling.[4]

In *Cicogna* we held that Section 1124 established the only reasons that would support a suspension of a public school's professional employee. A change in another employee's certification is not included within that list of reasons, so we held that Cicogna's suspension was improper. *Id.* Because we held that Section 1124 prevented the school board from allowing a teacher to change certification when it led to suspension of another teacher, I believe it also prevents a board from allowing a teacher to transfer into another program when that transfer accomplishes the same result.

Our rationale in *Cicogna* was based entirely on the restriction of the board's actions imposed by Section 1124.[5] We held that the statute enumerated the only reasons for a suspension. To have held otherwise would have been tantamount to saying that, in addition to the statutory criteria for furloughs, it is also appropriate to suspend an employee when another teacher elects to change her certification. We declined to broaden the statute in that way, and kept to a narrow reading of the act.

**4.** Judge Palladino, dissenting in *Cicogna,* construed the seventh layoff as a precipitate of the declining enrollment, and consequently, sanctioned that layoff.

**5.** *See also, Hixson v. Greater Latrobe School District,* 52 Pa.Commonwealth Ct. 92, 421 A.2d 474 (1980).

I can see no difference between the situation we faced in *Cicogna* and that which presents itself today. In *Cicogna* another teacher wanted to exercise her right to change her certification; in this case a teacher wants to exercise her right to transfer into another program, causing the furlough of the most junior psychologist. If Section 1124 prevents the exercise of rights in the first instance, so too, must it do so in the second.

I find the majority's attempt to distinguish *Cicogna* unpersuasive. In essence, the majority's position is that the difference between *Cicogna* and this case is that in *Cicogna* the school board performed a positive act when it authorized a fellow teacher's decertification. In the case now before us, the majority finds no such positive act. This is factually incorrect. In this case the School authorized Kmetz–Donovic's transfer from a teaching position to the Psychology Department. This authorization of transfer is a positive act, and to me, it is indistinguishable from the authorization for decertification found in *Cicogna*. Just as in *Cicogna*, but for this authorization no additional furloughs would be required. Therefore, the necessary conclusion is that the additional furlough will result from the School's positive act.

After Kmetz–Donovic was displaced in the realignment process, there existed open teaching positions which she could have elected without causing any furlough. Her decision to request transfer into another program places the School on the horns of a dilemma under the majority's decision. The School may not refuse the requested transfer in the majority's view of this case, and it may not furlough a teacher as a consequence of the transfer under *Cicogna*. If the School permits the transfer, it commits a positive act and if that act results in the furlough of another employee the rule of *Cicogna* is offended.

Nor can it be pertinent to our inquiry under the *Cicogna* case whether the resulting furlough immediately follows the School's act or whether there are other intervening employee moves. Under the checkerboard system of rea-

lignment a school district must take into consideration the fact that the employee immediately affected by the bump has the right to bump a less senior employee. In the case of an employee's election to bump a less senior employee in the same building or program the bumping right is absolute and does not require a positive act by the School. Consequently, once the School permits Kmetz–Donovic's transfer, it cannot stop the automatic checkerboard moves. The School's only opportunity to prevent Siegal's furlough is to refrain from granting Kmetz–Donovic's transfer.

Because of our holding in *Cicogna,* I believe we must hold that it would be improper for a teacher to be suspended in order to accommodate another teacher's transfer between programs. If we were also to uphold the arbitrator's opinion that Kmetz–Donovic had a contractual right to transfer into the psychologist's job, the practical effect of our holding would be that the School would be obliged to retain an employee for which it had no position. Such an impractical and economically unsound result ought to be avoided.

For these reasons, I respectfully dissent.